IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAUL KENDRICK,<br><br>     *Plaintiff*,<br><br>v.<br><br>GEORGE LITTLE, *et al*,<br><br>     *Defendants*. | Civil Action No. 2:23-cv-187<br><br>Hon. William S. Stickman IV<br>Hon. Maureen P. Kelly |

### MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

  Plaintiff Paul Kendrick ("Kendrick"), who is proceeding *pro se*, brought this civil rights action pursuant to 42 U.S.C. § 1983 alleging that Defendants[1] violated his constitutional rights by retaining him in "solitary confinement" for a prolonged period without due process of the law and were deliberately indifferent to his serious medical conditions. (ECF No. 7). He is incarcerated in the Pennsylvania State Correctional Institution ("SCI") in Fayette ("SCI-Fayette") serving a life sentence for first-degree murder. Before the Court is Kendrick's motion seeking a temporary restraining order and preliminary injunction. (ECF No. 42). He wants the Court to issue an order releasing him to the prison's general population. For the reasons set forth below, the Court will deny the motion.

---

[1] Defendants Secretary George Little, Executive Deputy Secretary Tabb Bickle, SCI-Fayette Superintendent Eric Armel, Deputy Superintendents Walker and Trempus, Majors Tkacs and Hawkinberry, Psychologists Amy Shaup and Regina Graft, Unit Manager Riddle, and Counselor Cook are employed by the Pennsylvania Department of Corrections ("DOC") ("Corrections Defendants"). Defendant Peter Saavedra ("Dr. Saavedra") is a psychiatrist and contract employee of the DOC.

1

## I. BACKGROUND

On March 1, 2018, criminal charges were filed against Kendrick in the Somerset County Court of Common Pleas at Docket Number CP-56-CR0000264-2018 for the February 15, 2018 first-degree murder of a corrections officer and the assault of another officer at SCI-Somerset on February 15, 2018. (ECF No. 51-8). The next day, Kendrick was placed in the Restricted Housing Unit ("RHU") to serve Disciplinary Custody ("DC") time for misconducts he received from the events of February 15, 2018. Kendrick was then transferred to SCI-Huntingdon and then transferred to SCI-Greene where he remained until he was transferred to SCI-Fayette on June 29, 2022. (ECF No. 51-1, p. 2).

Since his placement in the RHU on February 16, 2018, Kendrick has either been on DC status or Administrative Custody ("AC") status pursuant to DC-ADM-802 because he was a danger to some persons in the facility who could not be protected by alternate measures. (ECF No. 51-1, pp. 2-3). The Court's review of the evidence (ECF Nos. 51-1 through 51-10) confirms the Corrections Defendants' explanation that:

> On July 2, 2022, shortly after arriving at SCI-Fayette, Kendrick received a misconduct for assaulting staff. Exhibit C. Kendrick was found guilty and sanctioned to 90 days DC time. Exhibit A, ¶ 7. On September 29, 2022, Kendrick completed his DC time and was converted back to AC status. Id., ¶ 8. Kendrick remained on AC status until he received a misconduct for threatening staff on July 12, 2023, for which he received 30 days DC time. Exhibit A, ¶ 9; Exhibit D. On August 24, 2023, Kendrick's DC time expired and he was converted back to AC status, where he remains. Exhibit A, ¶10.
> 
> Inmates on AC status, such as Kendrick, receive periodic reviews of their status by a Program Review Committee (PRC). Exhibit B, DC-ADM, Section 2, D. (p. 17). Inmates are reviewed by the PRC every 7 days for the first two months, and then a minimum of once every 90 days thereafter. Id. In the case of a typical AC status inmate, the PRC may decide, as a result of the review, to release the inmate into general population without any further approval. Exhibit B, Section 4 (p. 24). However, Kendrick is part of a small subset of AC status inmates who are designated as being on the Department of Corrections' Restricted Release List (RRL). For RRL inmates, the PRC may recommend a release to

2

general population, but the final decision rests with the Executive Deputy Secretary for Institutional Operations (EDSI).  DC-AM 802, Section 4.B.

The living conditions of inmates in AC status are set forth generally in DCADM-802.  While DC-ADM-802 mandates that inmates be offered exercise one hour a day, five days a week, SCI-Fayette has adopted a local practice that longer term AC status inmates, such as Kendrick, receive 2 hours a day, 7 days a week of exercise in the yard.  Exhibit A, ¶ 14.  While in the yard for exercise, Kendrick may communicate with other inmates who are also in the yard.  Exhibit A, ¶ 15.

Inmates on AC status, such as Kendrick, have the opportunity to shower three times a week, conduct virtual visits, obtain leisure reading material, and earn additional privileges with positive and misconduct-free behavior.  Exhibit B, DCADM-802 Section 3.  These privileges include increased telephone calls, increased commissary, a radio and/or tablet and kiosk access, a television, and a General Labor Pool (GLP) stipend of 50 cents a day.  Exhibit B, DC-ADM-802 Section 3 (p. 21).  Kendrick has, during his misconduct-free periods, been approved for all of these extra privileges.  Exhibit A, ¶ 20.  Specifically, Kendrick was approved for the ability to conduct a virtual zoom visit with any approved visitor once a week (conducted out of cell), a GLP stipend to spend on commissary items, long term AC commissary status (which provides him with the ability to order more and different commissary items), a television, and a tablet and a kiosk send and receive emails, and make phone calls. Id.

In accordance with DC-ADM-802, Kendrick also has the ability to access educational services, library services, casework, counseling, diagnostic and classification services, behavioral health and treatment services, religious guidance and recreation programs.  Exhibit A, ¶ 19.

Kendrick's confinement is not solitary.  He has had the ability to conduct virtual visits, unlimited legal calls to an attorney, meet with a chaplain upon request, meet with his counselor, unit manager, and corrections officers all of whom conduct regular rounds to check on his needs.  Exhibit A, ¶¶ 14-26.

Importantly, mental health services are provided by psychology or psychiatry in accordance with policy 13.8.1.  Exhibit A, ¶ 26; Exhibit F.  Each inmate placed in the RHU is assessed for suicide potential upon entry to the RHU.  Exhibit G, ¶ 5.  Psychological staff are housed in the RHU where Kendrick is located, and Kendrick has the opportunity to voice any mental health concerns. Exhibit G, ¶ 4.  Kendrick is a C roster inmate who is assessed monthly, out of his cell, by the DOC's mental health providers.  Exhibit G, ¶ 8.  The purpose of the assessment is to determine "with reasonable assurances, whether the individual poses significant risk to themselves or others and to determine whether Restrictive Housing or Special Management Housing placement is contraindicated."[ ] Exhibit G, ¶ 8; Exhibit F, Policy 13.8.1, Section 1(f)vi.  Kendrick currently carries the following diagnoses: Adjustment Disorder with Mixed Anxiety and Depressed Mood, and Antisocial Personality Disorder.  Exhibit G, ¶ 11.  Kendrick is currently taking Effexor and Trazadone to treat his mental illness.  Exhibit G, ¶ 13. Kendrick is followed by a multidisciplinary Psychiatric Review Team (PRT) comprised of (1) LPM/PSS/PSA/Forensic Psychological Services Associate

>   (FPSA); (2) Psychiatrist/PCRNP; (3) Psychiatric Nurse/medical designee; (4) Corrections Counselor; (5) Corrections Officer; and/or a (6) Unit Manager. Exhibit G, ¶ 13. The PRT is responsible for initiation and maintaining Kendrick's individual recovery plan. Id.
>
>   Kendrick is offered out of cell time to attend the PRT meetings. Id, ¶ 14, Kendrick's most recent mental health evaluation was August 29, 2023, when he was seen by a psychiatrist and a Psychological Services Specialist out of cell for approximately 10 minutes. Exhibit G, ¶ 15. Kendrick will be seen according to policy or as needed and is aware of how to access psychology. Id., ¶ 16.

(ECF No. 50, pp. 2-6) (footnotes omitted).

Kendrick argues that he has been on the Restricted List for 4.5 years, and spent almost 5 years in solitary confinement in multiple state prisons. (ECF No. 7, ¶ 15; ECF No. 43, pp. 2-3). He remains in his "extremely small cell" for 22 to 24 hours a day and "typically the high beam light are on inside the cell." (ECF No. 43, p. 1). According to Kendrick, the conditions of his confinement have led to the deterioration of his mental illness (anxiety, extreme depression, frustration, loneliness, auditory and visual hallucination, and paranoia), and he has attempted suicide multiple times the most recent of which was on July 13, 2023. (*Id.* at 2). Kendrick opines, "I fear that my mental illness unless removed from solitary confinement will never, could never be restored to its full health." (*Id.* at 4). He wants removed from AC status, taken off the RRL list, placed in general inmate population, and placed in a "specialized therapeutic program." (*Id.*).

## II.    STANDARD OF REVIEW

The grant or denial of a preliminary injunction is within the sound discretion of a district court. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 178–79 (3d Cir. 2017) ("District courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their sound discretion.'" (citation omitted)). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v.*

4

*New Castle County*, 40 F.3d 645, 647 (3d Cir. 1994). The "status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). Further, where the requested preliminary injunctive relief "is directed not merely at preserving the status quo but ... at providing mandatory relief, the burden on the moving party is particularly heavy." *Punnet v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980). Mandatory injunctions should be used sparingly. *United States v. Price*, 688 F.2d 204, 212 (3d Cir. 1982).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Rather, such relief "should be granted only in limited circumstances." *Kos Pharms.*, 369 F.3d at 708 (citation omitted). A moving party "must establish entitlement to relief by clear evidence." *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018). Specifically, the movant must demonstrate:

> (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.

*Kos Pharms.*, 369 F.3d at 708; *see also Winter*, 555 U.S. at 20. It is the movant's burden to establish requirements for injunctive relief, especially for the first two prongs. *See Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975). The first two factors are "the most critical," and the moving party bears the burden of making the requisite showings. *Reilly*, 858 F.3d at 176, 179 (citations omitted). Once those "gateway factors" are met, a court should "consider[] the remaining two factors" and then "determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

In the prison context, a request for injunctive relief "must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and

5

intractable problems of prison administration.'" *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982)). Where a plaintiff requests an injunction that would require the Court to interfere with the administration of a prison, "appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief." *Rizzo v. Goode*, 423 U.S. 362, 379 (1976). The federal courts are not overseers of the day-to-day management of prisons. Prison officials require broad discretionary authority as the "operation of a correctional institution is at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974). Accordingly, prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that are needed to preserve internal order and to maintain institutional security. *Beard v. Banks*, 126 S. Ct. 2572, 2578 (2006); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Additionally,

> courts have been reluctant to accept inmate invitations to use preliminary injunctions as a means to judicially prescribe specific medical courses of treatment for inmates. In such instances, courts have typically declined such requests citing the inmate's failure to either demonstrate irreparable harm; *Rivera v. Pennsylvania Dep't of Corrections*, 346 F. App'x 749 (3d Cir. 2009), *Rush v. Correctional Medical Services*, Inc., 287 F. App'x 142 (3d Cir. 2008), or show a likelihood of success on the merits. *Quinn v. Palakovich*, 204 F. App'x 116 (3d Cir. 2006).

*Brown v. Wolf*, No. 16-1081, 2021 WL 3562473, at *5 (W.D. Pa. Aug. 12, 2021).

In reaching its decision on a request for injunctive relief, a district court sits as both the trier of fact and the arbiter of legal disputes. A court must, therefore, make "findings of fact and conclusions of law upon the granting or refusing of a preliminary injunction." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1178 (3d Cir. 1990) (citing Fed. R. Civ. P. 52(a)(2)). This "mandatory" requirement of Rule 52(a)(2) must be met "even when there has been no evidentiary hearing on the motion." *Id.* Nevertheless, at the preliminary injunction stage,

6

"procedures [] are less formal and evidence [] is less complete than in a trial on the merits." *Kos Pharms.*, 369 F.3d at 718; *see also AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) ("[T]he grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing [that] is the responsibility of the district judge." (citations omitted)). Accordingly, a court "may rely on affidavits and hearsay materials which would not be admissible evidence." *Kos Pharms.*, 369 F.3d at 718 (quoting in parenthetical *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)). But the weight given to such materials will "vary greatly depending on the facts and circumstances of a given case." *Id.* at 719.

### III. ANALYSIS

Incarceration necessitates that many rights and privileges be eliminated or curtailed. *Abu-Jamal v. Price*, 154 F.3d 128, 132-33 (3d Cir. 1998). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). However, that does not mean incarcerated individuals check their constitutional rights at the prison door. The question here is whether Kendrick has shown a likelihood of successfully establishing that his constitutional rights are being violated by Defendants and the probability that he will suffer irreparable harm if an injunction is not issued. He has not met his burden of showing that preliminary injunctive relief is warranted, and the Court will not grant him the relief he desires.[2]

---

[2] The standard for evaluating whether the issuance of a temporary restraining order ("TRO") is warranted is the same as that used for evaluating whether the issuance of a preliminary injunction is appropriate. The Court implicitly found that a TRO was an unnecessary form of injunctive relief—especially in light of the fact that the status quo is that Kendrick has been in DC or AC status and on the RRL due to the events of February 15, 2018 and his subsequent misconducts. No imminent emergency was present justifying the entry of a TRO. To the extent that no formal order was issued stating as much, the Court denies the request for a TRO.

### A. Kendrick has not demonstrated a reasonable likelihood of success on the merits.

Kendrick has not demonstrating a likelihood of success on the merits of his claims. To establish a reasonable probability of success on the merits, Kendrick had to produce sufficient evidence to satisfy the essential elements of the underlying cause of action, which he has not. *Punnett v. Carter*, 621 F.2d 578, 582–83 (3d Cir. 1980). The Court, as discussed below, has examined the legal principles controlling Kendrick's claims and the potential defenses available to Defendants, and it concludes that Kendrick's claims are not tenable.

As to Kendrick's due process claim, assuming his confinement implicated a protected liberty interest,[3] he has received all the process he was due – his status is regularly reviewed.[4]

---

[3] It is well established that neither solitary confinement nor placement on the RRL by itself impacts a protected liberty interest, and therefore due process concerns are not triggered. *See Young v. Quinlan*, 960 F.2d 351, 364 (stating that solitary confinement does not per se violate the Constitution "as long as the conditions of confinement are not foul, inhuman or totally without penological justification."); *Bowen v. Ryan*, 248 F. App'x 302, 304 (3d Cir. 2007) ("Placement on [the RRL] did not deprive [the inmate] of his liberty, privileges, or any other constitutionally protected liberty interest."). The Third Circuit has recognized that the prospect of prolonged and indefinite solitary confinement may give rise to a due process liberty interest in some circumstances. *See Porter v. Pa. Dep't of Corrs.*, 974 F.3d 431, 449–50 (3d Cir. 2020) (holding that inmate who had spent 33 years in solitary confinement had a due process liberty interest in avoiding further solitary confinement); *Shoats v. Horn*, 213 F.3d 140, 143–44 (3d Cir. 2000) (holding that inmate who had spent 8 years in solitary confinement in administrative custody with no prospect of immediate release in the near future had a protected liberty interest).

[4] "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property .... A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (internal citations omitted). "To establish [a state-created liberty interest under the Fourteenth Amendment] in the conditions of confinement context, courts generally require a showing that the alleged liberty interest is substantial. To rise to the level of a liberty interest, the right alleged must confer 'freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Williams v. Sec'y Pa. Dept's of Corrs.*, 848 F.3d at 559 (quoting *Griffin v. Vaughn*, 112 F.3d 703, 708 (3d Cir. 1997)) (alteration and emphasis in original).

As noted by the Corrections Defendants, some of the reviews actually resulted in increased privileges for Kendrick. Conducting periodic review of inmates indefinitely confined to AC status and placement on the RRL meets due process requirements. *See Shoats*, 213 F.3d at 147; *Washington-El v. Beard*, 562 F. App'x 61 (3d Cir. 2014). Nothing in the record demonstrates that Kendrick's initial placement on the RRL and continued confinement in AC failed to comply with the minimal requirements of due process in this context. Kendrick is not likely to succeed on the merits of his due process claim. *See Bramble v. Wetzel*, 2021 WL 3190710, at *6 (M.D. Pa. 2021) (denying inmates motion for preliminary injunction seeking release from AC status and an RRL designation because "the defendants have attested that [the inmate] is now receiving the periodic PRC reviews called for by Shoats and by DC-ADM 802" and "Given this attestation, [the inmate] has not shown a current likelihood of success on his due process claim.").[5]

As to Kendrick's Eighth Amendment denial of medical care and deliberate indifference claims against Corrections Defendants and Dr. Saavedra,[6] Kendrick seemingly cannot show that

---

[5] It is questionable that Dr. Saavedra even knew the length of Kendrick's stay in DC or AC status and placement on the RRL, and whether he had the authority to alter Kendrick's housing status or recommend a change in status.

[6] The Eighth Amendment to the United States Constitution proscribes the government from inflicting upon its citizens "cruel and unusual punishment" of any form. U.S. CONST. amend. VIII. More than two decades ago, in *Farmer v. Brennan*, 511 U.S. 825 (1994), the United States Supreme Court observed that this constitutional proscription requires prison officials to provide "humane conditions of confinement" to their charges. *Id.* at 832. Prison officials violate this guarantee when they "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Atkinson v. Taylor*, 316 F.3d 257, 272 (3d Cir. 2003). And, conditions of confinement which unreasonably jeopardize an inmate's mental health are the proper subject of constitutional scrutiny. *See Farmer*, 511 U.S. at 852. For an Eighth Amendment conditions of confinement claim, a prisoner must demonstrate: first, that he has been subjected to an objectively "serious" deprivation of life's basic needs or a "substantial risk of serious harm" to his health; and second, that defendants knew of and were deliberately

9

he is incarcerated under conditions posing a substantial risk of serious harm and that Defendants demonstrated a deliberate indifference to his health or safety. Kendrick has been at times approved for extra privileges, i.e., "a virtual zoom visit with any approved visitor once a week (conducted out of cell), a GLP stipend to spend on commissary items, long term AC commissary status (which provides him with the ability to order more and different commissary items), a television, phone calls, and a tablet and a kiosk send and receive emails." (ECF No. 50, pp. 14-15). He has the ability to access educational services, library services, casework, counseling, diagnostic and classification services, behavioral health and treatment services, religious guidance and recreation programs. Kendrick receives 2 hours a day, 7 days a week exercise. And, he has the ability to conduct virtual visits, unlimited legal calls to an attorney, meet with a chaplain upon request, meet with his counselor, unit manager, and corrections officers all of whom conduct regular rounds to check on his needs. (ECF No. 51-1, pp. 4-6).

Regarding Kendrick's mental health needs, he is receiving treatment for his diagnosed conditions – adjustment disorders, with mixed anxiety and depressed mood and antisocial personality disorder. He is prescribed two medications to treat his conditions. He has contact with the mental health staff located in the RHU and he receives a full out-of-cell evaluation at a minimum every 30 days. Kendrick can request to be seen by psychology or psychiatry any time he feels he needs mental health care. (ECF No. 51-7, pp. 2-4). When Kendrick last attempted suicide, he admits that he was moved to a psychiatric observation cell after the incident for close monitoring. (ECF No. Doc. 43, p. 2).

Corrections Defendants have set forth legitimate penological interests for keeping Kendrick separated from other prisoners. Kendrick's AC status and placement on the RRL is a

---

indifferent to that deprivation or risk. *Farmer*, 511 U.S. at 834; *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 227–28 (3d Cir. 2015).

10

reasonable response to the threat he presents to staff and other inmates. The record currently before the Court does not demonstrate that Defendants are deliberately indifferent to Kendrick and his mental health needs.

For these reasons, Kendrick is not likely to succeed on the merits of his claims. Nevertheless, assuming his claims are meritorious, the Court finds that the following other considerations weigh against the grant of injunctive relief.

### B. Other considerations weigh against injunctive relief.

The remaining elements of a preliminary injunction have not been met.

First, Kenrick bears the burden of establishing a "clear showing of immediate irreparable injury." *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989). A preliminary injunction cannot be issued based on past harm. The purpose of a preliminary injunction is to prevent future irreparable harm. This is not an easy burden as the claimed injury cannot merely be possible, speculative or remote. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000). Kendrick has not sufficiently demonstrated that he would likely suffer irreparable harm if an injunction was not granted. "[A]s a general matter, confinement of inmates in isolation units is hardly unusual." *Parkell v. Danberg*, 833 F.3d 313, 333 (3d Cir. 2016); *see also Torres v. Fauver*, 292 F.3d 141, 150 (3d Cir. 2002) ('[D]isciplinary detention and administrative segregation [are] the sort[s] of confinement that inmates should reasonably anticipate receiving at some point in their incarceration....')." An injunction will not issue simply to eliminate the possibility of a remote future injury, like a possible denigration in Kendrick's mental health. There is nothing before the Court to suggest that Kendrick is receiving inadequate mental health treatment. He has access to mental health staff and medication. The information before the Court does not indicate that the DOC has been deliberately indifferent to Kendrick's mental

11

health conditions or vulnerability to suicide. Kendrick has failed to demonstrate to the Court's satisfaction that a preliminary injunction is the only way to protect him from speculative future harm.

Second, in considering whether granting preliminary relief will result in greater harm to the non-moving party (Defendants), the Court must balance the harm to Kendrick if the preliminary relief is erroneously denied, and the harm to Defendants if the preliminary relief is erroneously granted. The possibility of harm to Defendants in the event that preliminary relief is erroneously granted appears to be substantial.

> Where a plaintiff requests an injunction that would require the Court to interfere with the administration of a state's prison or jail, "appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief." *Rizzo v. Goode*, 423 U.S. 362, 379 (1975). The federal courts are not overseers of the day-to-day management of prisons. Prison officials require broad discretionary authority as the "operation of a correctional institution is at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974). Accordingly, prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that are needed to preserve internal order and to maintain institutional security. *Bell v. Wolfish*, 441 U.S. 520, 527 (1979).

*Chruby v. Kowaleski*, Civil Action No. 11-225J, 2012 WL 12875986, at *5 (W.D. Pa. May 1, 2012). Injunctive relief (like imposing restrictions on the placement of Kendrick on AC or DC status or on the RRL) would substantially impair the ability of prison officials to preserve order and maintain security within the prison.

While incarcerated for life for committing first-degree murder, Kendrick is alleged to have murdered one corrections officer and assaulted another in 2018. Since that time, he has continued to accumulate misconducts including one in July 2022 for striking a correction officer's hand through a feed aperture. (ECF No. 51-3). Corrections Defendants submit that they

"continue to review Kendrick's adjustment periodically for consideration for removal from AC status and the RRL." (ECF No. 50, p. 18).  But, they maintain that,

> Kendrick has not, in any filing with the court, or otherwise, accepted responsibility for his past conduct, shown remorse, or given any indication that he would not assault or murder again if he is released to the general population. Kendrick, at the present, may be the type of inmate for whom AC status may be a necessary tool "to control … inmates whose presence within the general population would create unmanageable risks." *See Young v. Quinlan*, 960 F.2d 351, 364 (3rd Cir. 1992) (citing *Hutto v. Finney*, 437 U.S. 678, 685–86 (1978)).

(ECF No. 50, p. 18). The Court agrees with Corrections Defendants that, "[r]eleasing an inmate with a known violent history to general population for the purpose of associating with other inmates can subject prison officials to liability if that inmate subsequently assaults another inmate." (*Id.* at 19). The speculative harm to Kendrick's mental health simply does not outweigh the harms that the Corrections Defendants and the DOC actually face. Unlike Kendrick, their fear of future injury is real.

Lastly, "[i]n considering where the public interest lies, it is essential to evaluate the possible effects upon the public from the grant or denial of injunctive relief." *O'Burn v. Shapp*, 521 F.2d 142, 152 (3d Cir. 1975). Given the Supreme Court's instruction that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment," injunctive relief at this stage would not be in the public interest. *See Sandin v. Conner*, 515 U.S. 472, 482 (1995). State prison officials are specially trained and compensated by the public to handle the daily operation and maintenance of maximum security prisons. Judicial deference is accorded to their decisions, "not merely because the administrator will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive branches of our Government, not the Judicial." *Bell v. Wolfish*, 441

U.S. 520, 548 (1979). Granting Kendrick's requested injunctive relief (placement in the general prison population) would damage the independence and authority of the DOC—the body entrusted by Pennsylvania law with setting policy and procedures for its state correctional institutions. It would lead, in practical effect, to the elevation of this Court's prudential judgment over the DOC's execution of policies and practices that are needed to preserve internal order and to maintain institutional security.

The Court recognizes that it is also in the public interest that government employees, including prison officials and staff, do not violate the Constitution. But, the weight to accord to this is dependent upon the strength of a case on the merits, which the Court has found to be lacking here. The public interest in this case weighs in favor of the Court declining to interfere with the DOC's operation of SCI-Fayette.

### IV.  CONCLUSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. In this case, after balancing all four factors, the Court finds that Kendrick has failed to carry his burden of demonstrating that he is entitled to the extraordinary relief of an injunction. Kenrick's motion will be denied by Order of Court to follow.

BY THE COURT:

*/s/ William S. Stickman IV*
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

9-18-23
Date